**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| **CATHERINE HEROMAN** | * | |
| Plaintiff | * | |
| | * | Case No.: 8:19-cv-2098-PWG |
| v. | * | |
| **TEACHING STRATEGIES, LLC,** | * | |
| | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Catherine Heroman was a longstanding and valued employee of Teaching Strategies, LLC ("TS").[1] While working for TS she authored a series of books and other works on early childhood educational programming. FAC ¶ 6. By 2008, Ms. Heroman was thinking of retiring from TS, but the company considered her so valuable that it offered her a series of

---

[1] Teaching Strategies, LLC is the successor in interest of Teaching Strategies, Inc., Ms. Heroman's original employer. Between 2008 and 2012, Ms. Heroman entered into a series of agreements with one or the other of these entities, including: (1) a February 20, 2020 Agreement (signed in March, 2008 but effective as of February 20, 2008) (the "2008 Agreement," Ex. 1 to First Am. Compl. ("FAC"), ECF No. 18-1); (2) Amendment No. 1 to the 2008 Agreement (signed on March 11, 2011, but retroactively effective as of July 1, 2010) ("First Amendment," Ex. 1 to Def.'s Mot., ECF No. 20-2 at 18); (3) Amendment No. 2 to the 2008 Agreement (signed by Ms. Heroman on December 22, 2011, and apparently effective as of that date) ("Second Amendment," Ex. 3 to FAC, ECF No. 19); and (4) a Royalty Agreement bearing Ms. Heroman's initials as of December 22, 2011, and presumably signed on that date, but effective as of February 20, 2008) ("Royalty Agreement," Ex. 2 to FAC, ECF No. 18-2). For the sake of simplicity, this Memorandum will simply refer to Teaching Strategies LLC or TS regardless of whether the particular agreement being discussed was signed by Teaching Strategies, Inc., or Teaching Strategies, LLC.

1

inducements to continue her employment beyond January 1, 2009. FAC ¶ 7–8. Those inducements included: (1) special recognition of sick leave hours Ms. Heroman had acquired; (2) designating her as an author or co-author of specifically identified materials that she already had written as an employee of TS, or was expected to write while an employee of TS; (3) a "Stay Bonus" that would entitle her to periodic payments so long as she remained an employee; and (4) Royalty Payments for the materials that she had authored or co-authored that she would receive upon her retirement from TS. This benefits package was memorialized in an Agreement that became effective as of February 20, 2008 (the "2008 Agreement"). *Id.* at ¶ 8. Attachment C to the 2008 Agreement was a sample Royalty Agreement that the parties agreed would be used with regard to each of the materials that Ms. Heroman had authored or co-authored, and for which she would be entitled to royalty payments.

The 2008 Agreement was amended twice. Amendment No. 1 became effective as of July 1, 2010, but it actually was signed on March 11, 2011 ("First Amendment"). Importantly, the First Amendment contained an exhibit, B2, which designated "The Creative Curriculum System for Preschool (English only, Spanish only, Bilingual)" (the "System") as a work that Ms. Heroman had authored or co-authored, and for which she was entitled to royalties in accordance with the 2008 Agreement. Ex. 1 to Def.'s Mot. 18–20 (First Amendment). Amendment No. 2 was signed by Ms. Heroman on December 22, 2011.[2] FAC ¶ 14. Finally, Ms. Heroman and TS entered into a Royalty Agreement, effective as of February 20, 2008, but signed by Ms. Heroman on December 22, 2011, and by TS on January 3, 2012, attached to which was Exhibit A, listing works for which

---

[2]   TS attached a copy of the Second Amendment as an exhibit to its motion to dismiss. Ex. 2 to Def.'s Mot., ECF No. 20-3. Although signed and dated by Ms. Heroman on December 22, 2011, it is not signed by TS. Neither Plaintiff nor Defendant dispute that it was signed by TS, however, and neither disputes the authenticity of this agreement as binding between the parties.

Ms. Heroman was entitled to royalty payments as contemplated by the 2008 Agreement. FAC ¶ 10–11; Royalty Agreement 5–7. It, too, listed the System as one of the works for which Ms. Heroman was entitled to royalty payments. Ms. Heroman retired from TS at the end of 2012, at which time she became entitled to royalty payments for the works that she had authored or co-authored. FAC ¶ 16.

Ms. Heroman has sued TS to recover royalty payments for the System that she claims that she was entitled to under the above agreements. *Id.* at ¶ 34–37. TS disagrees, and it has filed a motion to dismiss, claiming that Ms. Heroman has failed to state a claim for breach of contract. The motion is fully briefed, ECF Nos. 20, 21, 22. A hearing is unnecessary. *See* Loc. R. 105.6 (D. Md. 2018). As explained below, the motion is DENIED.

As noted above, after she retired at the end of 2012, TS paid Ms. Heroman royalties for her works. FAC ¶¶ 16, 18. In 2016, TS marketed and sold *The Creative Curriculum® for Preschool, 6th Edition, with Daily Resources* ("Sixth Edition") and *The Creative Curriculum® for Preschool, Deluxe Edition* ("Deluxe Edition"), but did not pay Ms. Heroman royalties on sales of the either edition. *Id.* ¶ 19, 29. Ms. Heroman claims that she is entitled to royalties for sales of the Sixth Edition and the Deluxe Edition because they rely predominantly on the substance of the System, which she wrote. Further, she argues, the contract entitled her to royalties on the System and notes TS had been paying her royalties on it until it released the Sixth Edition and Deluxe Edition.

The essence of TS's motion to dismiss under Fed. R. Civ. P. 12(b)(6) is that Ms. Heroman is not entitled to royalties for sales of the Sixth Edition and Deluxe Editions because they were "Future Products" based on the System, and therefore exempt from royalty payments by paragraph 4(ii) of the 2008 Agreement. Nonsense, Ms. Heroman says. As she reads the 2008 Agreement,

the restrictive language in paragraph 4(ii) applies only to her entitlement to pre-retirement bonus payments, not royalties that she is entitled to in retirement. TS is convinced that the agreements it signed with Ms. Heroman are unambiguous, and that they validate its position. Ms. Heroman is equally adamant that the agreements are unambiguous, concluding that they support her position. But, as I read the agreements, I find that, objectively viewed, there is language in them that supports the positions that each party has taken in this case, and that, collectively read, as they must be, they are ambiguous as to whether the restrictive language in paragraph 4(ii) of the 2008 Agreement prohibits royalties for sales of the Sixth Edition and Deluxe Edition. For that reason, I deny the motion to dismiss, and this case will proceed to discovery.

## Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). To that end, the Court bears in mind the requirements of Fed. R. Civ. P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678–79; *see Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss, "[t]he court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013); *see also CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Moreover, where the allegations in the complaint conflict with an attached written instrument, "the exhibit prevails." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *see also Azimirad v. HSBC Mortg. Corp.*, No. DKC-10-2853, 2011 WL 1375970, at *2–3 (D. Md. Apr. 12, 2011).

**Discussion**

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I must decide whether the complaint sufficiently alleges a claim for which there is a legal remedy. In this case, the complaint must allege a breach of contract. To allege a breach of contract under Maryland law (which the parties do not dispute is the applicable law, Def.'s Mot. Mem. 11; Pl.'s Resp. 14) the plaintiff's claim must allege (1) contractual obligation, (2) breach, and (3) damages. *Tucker v. Specialized Loan Serviving, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015). A breach of contract is "a failure without legal excuse to perform any promise which forms the whole or part of the contract . . . ." *Green v. Jenkins Services, LLC*, No. PWG-16-2572, 2018 WL 1761960, at *3 (D. Md. Apr. 13, 2018) (quoting *In re Ashby Enters., Ltd.*, 250 B.R. 69, 72 (Bankr. D. Md. 2000)). I must also construe all well-pleaded facts in favor of the nonmovant. *Nemet Chevrolet, Ltd. v.*

5

*Counseumeraffairs.com*, 591 F.3d 250, 255 (4th Cir. 2009). Because the parties do not dispute the authenticity of the exhibits to the complaint and the motion to dismiss, and because those exhibits consist of the contracts at issue and thus are integral to the complaint, I will consider the exhibits in addition to the complaint. *Sposato*, 2013 WL 1308582, at *2.

In this case, whether TS breached the contract depends on the nature of its contractual obligation to Ms. Heroman, which the parties do not dispute must be objectively interpreted by the Court. Def.'s Mot. Mem. 12; Pl.'s Resp. 14; *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177 (2015).

> Maryland courts adhere to the principle of objective interpretation of contracts . . .; *i.e.*, if the language employed is unambiguous, 'a court shall give effect to its plain meaning and there is no need for further construction by the court.' . . . [We] attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect.

*City of Coll. Park v. Precision Small Engines*, 161 A.3d 728, 734 (Md. Ct. Spec. App. 2017) (quoting *Walker v. Dep't of Human Res.*, 842 A.2d 53 (Md. 2004)); *see also Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964) ("A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.").

Further, where, as here, the "contract" comprises "two or more documents, the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect." *Schneider Electric Buildings Critical Sys., Inc. v. Western Surety Co.*, 454 Md. 698, 707 (2017), (citing *Rourke v. Anchem Prod. Inc.* 384 Md. 329, 354 (2014)); *see also Rocks v.*

*Brosius*, 241 Md. 612, 637 (1966); *Rothman v. Silver*, 245 Md. 292, 296 (1967); *Bachman v. Glazier & Glazier, Inc.*, 316 Md. 405, 415 (1989).

In the context of contract law, Maryland Courts define the term ambiguity as "when the language of the contract is susceptible to more than one meaning to a reasonably prudent person." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340 (1999); *see also Ragin v. Porter Hayden Co.*, 133 Md. App. 116, 136 (Md. Ct. Spec. App. 2000) (citing *Calomiris v. Woods*, 353 Md. 425, 436 (1999)). The parties' disagreement as to a term does not suffice to create ambiguity; instead, the reviewing court must view the contract through the lens of a reasonably prudent person. *See Baltimore Scrap Corp. v. RLI Ins. Co.*, No. ELH-18-2743, 2020 WL 6044294, at *11 (D. Md. Oct. 9, 2020) (citing *Fultz v. Shaffer*, 111 Md. App. 278, 578 (1996)). If, at the motion to dismiss stage, a court finds that a contract is ambiguous, dismissal is improper because the ambiguity creates a disputed factual issue. *See Walmart Real Estate Bus. Trust v. Quarterfield Partners, LLC*, No. SAG-18-3664, 2019 U.S. Dist. LEXIS 63123, at *16 (D. Md. April 23, 2019) (citing *Butz v. Pulte Home Corp.*, No. PX-16-1508, 2017 WL 679226, at *4 (D. Md. Feb. 21, 2017)); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) ("[T]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.") (citing *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)).

Here, the 2008 Agreement is the starting place. As noted, it served a variety of employment related purposes: (1) it confirmed Ms. Heroman's continued status as an at-will employee of TS (¶ 1); (2) it gave special recognition to her past accrual of sick leave hours and how they would impact her benefits if she became disabled (¶ 2); (3) at ¶ 3, it provided for her to be designated as an author or co-author for "certain books, publications and/or other materials" set out in an

7

attachment to the contract, referred to as "Works" (or, individually, as a "Work"), and this definition contained none of the restrictive language found in ¶ 4(ii), which discussed her Stay Bonus; (4) it discussed her entitlement to a "Stay Bonus," provided she did nor retire prior to January 1, 2009 (¶ 4(i)-(vii)); and (5) it established her entitlement to royalty payments for "Works" that she had authored or co-authored while an employee, effective upon her retirement date (¶ 5).[3]

Importantly, the two paragraphs of the 2008 Agreement that most directly speak to Ms. Heroman's entitlement to post-retirement royalties for "Works" that she authored or co-authored are ¶ 3 and ¶ 5. Neither uses the "refined" (and more restrictive) definition of "Work" or "Works" found in ¶ 4—by far the longest substantive portion of the 2008 Agreement, the focus of which is the pre-retirement Stay Bonus. TS contends, however, that, despite its location in the "Stay Bonus" paragraph, the restrictive "further refinement of 'Works' definition" applied to broadly to "this Agreement," not just to the Stay Bonus. 2008 Agreement, ¶ 4(ii). That subparagraph states, relevantly, "[f]or purposes of *this Agreement* . . . the term 'Work' or 'Works' shall include *only the fully completed original print publication(s) of each book or publication* set forth [on any attachment designating the Works that Ms. Heroman authored] . . . . The term 'Work' or 'Works,' as the case may be, shall *not include any future products based on the Original Print Publication . . . such as revisions or derivative works (any of such future products, collectively, the '***Future Products***')*" . . . . *Id.* (italics added). And to substantiate its argument that the Sixth Edition is a Future Work, TS points to the fact that it was updated and revised, and that a new copyright was issued. Def. Mot. Mem. 14; FAC ¶¶ 17–23.

---

[3] The 2008 Agreement also had a choice of law provision (Maryland) (¶ 8), an integration clause (¶ 14) and a waiver of jury trial provision (¶ 15).

TS also argues that the language in the First and Second Amendments to the 2008 Agreement further support their argument that its contract with Ms. Heroman does not allow her to receive royalties for the 2016 Edition or Deluxe Edition, each of which is a "revision or derivative work" of the System. Indeed, the First Amendment states that it amends the 2008 Agreement, and that "capitalized terms [such as "Work"] not otherwise defined herein shall have the meanings ascribed to them in the [2008] Agreement," and, at ¶ 5, "[i]n all other respects the [2008] Agreement is hereby ratified and reaffirmed." First Amendment, Ex. 1 to Def.'s Mot 18. The same applies to the Second Amendment ("[a]ny capitalized terms [such as "Works"] used but not defined herein have the meanings specified in the [2008] Agreement" (Second Amendment ¶ 1, Ex. 3 to FAC, ECF No. 19), and "[i]n all other respects, the provisions of the [2008] Agreement are hereby reaffirmed," (Second Amendment ¶ 9). And, finally, TS points out that the Royalty Agreement entered into between it and Ms. Heroman (signed by her on December 22, 2011, and by TS on January 1, 2012, but effective retroactively as of February 20, 2008), which identified the System as one of Ms. Heroman's "Works," concluded with this language: "This Royalty Agreement and the [2008] Agreement are the sole agreements between the parties regarding the Works. All prior negotiations, agreements or discussions between the parties regarding the Works are merged into this Royalty Agreement, except for the [2008] Agreement." Royalty Agreement ¶ 7, Ex. 2 to FAC.

TS concludes that the cumulative effects of these multiple agreements is that the definition of "Works" in paragraphs 3 and 5 of the 2008 Agreement (which define the "Works" for which Ms. Heroman was a designated author, and her entitlement to royalty payments upon retirement) are modified by the restrictive definition of "Works" contained in paragraph 4(ii), thus eliminating her entitlement to royalties for revisions or derivative works based on any "Work" she authored.

And, for good measure, TS argues that the 2008 Agreement contains language that "[t]he headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent." 2008 Agreement, ¶ 11. Therefore, they reason, Ms. Heroman cannot rely upon the fact that the restrictive definition of the "Works" is found only in paragraph 4 of the 2008 Agreement, titled "'Stay' Bonus." Def.'s Reply 3, n.2, ECF No. 22.

And, aside from relying on the terms and construction of the contracts, TS argues that if Ms. Heroman sought royalties on the basis that portions of the 2016 Edition and the Deluxe Edition contained identical, or nearly identical, language from the original System, she should have sought a pro rata royalty for residual content in future versions of the System. Def.'s Mot. Mem. 14–15. TS points to Ms. Heroman's negotiation of a pro rata royalty for an online subscription version of one of her works as evidence that such arrangements are commonplace. *Id.* at 11; Ex. 3 to FAC 5 (Item 1(b)).

Ms. Heroman strongly disagrees. She points out that the restrictive language in paragraph 4(ii) of the 2008 Agreement is limited to her entitlement to pre-retirement bonus payments, not her royalty payments. Specifically, the limiting language states: "The term 'Work' or 'Works,' as the case may be, shall not include any future products based on the Original Print Publication . . . such as revisions or derivative works . . . none of which such Future Products *shall be considered in the calculating of the Bonus* for which the Employee may become eligible pursuant to this Agreement." This language shows, she contends, that when the parties intended to restrict Ms. Heroman's entitlement to payments based on her authorship of Works, they used specific language making this intent clear, as in paragraph 4(ii). That they could easily have done so, yet did not, in paragraph 5 of the 2008 Agreement, which set out her entitlement to royalty payments, means that they did not intend the paragraph 4(ii) restrictive definition of Works to apply to royalty payments.

Moreover, Ms. Heroman contends, the Royalty Agreement itself supports her position. At paragraph 2.A (dealing with the commencement of her royalty payments) it states: "After the earlier of (i) Employee's 'Retirement date' or (ii) the date of closing of a 'Change in Control' [of TS] (*as each such term is defined in the Agreement dated as of February 20, 2008*, as amended by Amendment No. 1 dated as of July 1, 2010, by and between TSI and Author, as amended and as it may hereafter be further amended . . . Author will begin to accrue royalties on the Works . . . ." Royalty Agreement ¶ 2, Ex. 2 to FAC. This demonstrates that, when the parties intended to adopt one of the specific terms of the 2008 Agreement to qualify a subsequent amendment, they knew exactly how to do so. The fact that the Royalty Agreement did not similarly incorporate the restrictive definition of Works found in the Bonus provisions of the 2008 Agreement when discussing the Works for which Ms. Heroman was entitled to receive royalties means, she argues, that they did not intend for those restrictions to apply. *See* Pl.'s Resp. 8.[4] But even if the Court were compelled to find the Stay Bonus definitions applied more broadly, Ms. Heroman argues, those definitions were nullified by the 2012 change in control at TS, which terminated the Stay Bonus agreement, according to Ms. Heroman's reading of Amendment No. 2 to the 2008 agreement. Pl.'s Resp. 19; Second Amendment ¶ 4 (section titled "Termination of Stay Bonus Plan"). According to Ms. Heroman, terminating the Stay Bonus agreement eliminated the Further Refinement of Works Definition. Pl.'s Resp. 19.

And finally, Ms. Heroman argues that the changes TS made to the System in the 2016 Edition and the Deluxe Edition were *de minimus*, citing TS's own advertisement of the System

---

[4] *See also* Exhibit C to the 2008 Agreement (sample Royalty Agreement that the parties agreed to use) which states, at paragraph 2.A "For purposes of this Royalty Agreement, 'retires' shall be *defined in the same manner as such term is defined in that certain agreement by and between the parties made as of . . .[February 20, 2008] (the 'Agreement')*" (emphasis added). Ex. 1 to FAC 11.

11

that downplayed any changes due, in large part, to the prior version's success. FAC, ¶ 21, 23; Pl.'s Resp. 12. As to the Deluxe Edition, Ms. Heroman states stating it is simply the System bundled with other items and sold as a separate work. FAC, ¶ 29–31. In terms of Ms. Heroman's entitlement to royalties for the System, she cites Exhibit A to the Agreement, which established her royalty rates, to argue the Agreement did not limit royalties for that work. Rather, "all sales of the System, in whatever format, were covered in Item 7." *Id.* at 16.

In reply, TS argues Amendment No. 2 did not address the restrictive definition of Works. Def.'s Reply 4–5, 8–9. Indeed, according to TS, had the parties intended to remove Section 4 in its entirety, including the restrictive Works definition, they would not have revised only Section 4(i). Amendment 2, TS notes, did not address Section 4(ii). *Id.* at 9.

This is not a straightforward motion to dismiss premised on a single contract with consistent terminology the clear meaning of which can be discerned by an objective reading of the language chosen by the parties. Instead, this case presents a situation where the parties entered into an initial contract which sought to accomplish a series of distinct objectives, and thereafter modified it in the course of four years in response to a variety of changed circumstances. Along the way, the amendments to the Agreement referred back to the definitions in the original 2008 Agreement with varying degrees of clarity and consistency, making the true nature of their agreement susceptible to two inconsistent, but reasonable, interpretations. In a nutshell, attempting to divine the meaning of these multiple agreements that constitute a single contract leaves me with the conclusion that both parties have plausible interpretations of the language, which is the essence of contractual ambiguity.

The provisions governing the royalty agreement between Ms. Heroman and TS are ambiguous because they are susceptible to multiple interpretations by a reasonably prudent person.

First, TS clearly manifested an intent to compensate Ms. Heroman for her publications by paying her royalties at various specified rates. That arrangement, based on the language of the contract, was to last until the earlier of 50 years from the date of the contract or, if she predeceased her children, the death of Ms. Heroman's last living child. Royalty Agreement ¶ 2(G). Accordingly, it is reasonable for Ms. Heroman to have expected continued payments after 2016.

Second, in the Royalty Agreement, the term "Works" is defined in the following clause: "TSI intends to create, produce, publish and sell has [sic] created, produced, published and sold, or intends to do so, that particular works identified on the Exhibit A attached hereto and incorporated herein by reference (the "Works")." Royalty Agreement 1. Exhibit A lists a series of works, including "The Creative Curriculum System for Preschool" but nowhere does the exhibit reference the limitation TS seeks to impose on Ms. Heroman's entitlement to royalties. *Id*. at 5. This lack of an explicit reference to the restrictive definition of works in the section governing Ms. Heroman's compensation for her publications, combined with a broader definition within the Royalty Agreement and the parties' use of cross refences elsewhere, such as with the term retirement (*e.g. supra*, note 4), create ambiguity within the Royalty Agreement.

Third, the placement of the disputed term—"future works"—creates ambiguity. None of the controlling agreements contained a broadly applicable definitions section. Rather, the supposedly restrictive language appeared on the second page of the Agreement in a section concerning her "Stay Bonus." While the definition was preceded by a clause reading "[f]or purposes of this Agreement," it remains unclear that either a Sixth or Deluxe Edition of "The Creative Curriculum System for Preschool," as the work was listed in Exhibit A to the Royalty Agreement, would qualify as a future work and thus be excluded from the Royalty Agreement. 2008 Agreement 2, Ex. 1 to FAC; Royalty Agreement 5, Ex. 2 to FAC. And as Ms. Heroman's

13

response to the motion to dismiss argues, the royalty section of the Agreement contained neither a further refinement of the term Works, nor an explicit incorporation of the definition in the Stay Bonus section. Pl.'s Resp. 4.

What's also ambiguous is not only the applicability of the definition of "future works," but whether the Sixth and Deluxe Editions are in fact future works under the aforementioned definition. The revisions to the Sixth Edition, as stated in TS's motion and acknowledged by Ms. Heroman, were that "at a minimum TS: (1) made updates and revisions to the first three foundational volumes; (2) extended the content of the 4th volume to include first through third grades; and (3) added a sixth book entitled 'Science and Technology, Social Studies and the Arts.'" Def.'s Mot. Mem. 10. Additionally, a new copyright was issued for the Sixth Edition. *Id.* at 14. As to the Deluxe Edition, Ms. Heroman alleges it is simply the System "bundled with some additional items and sold as a different work." FAC, ¶ 29.

These changes may very well be simple additions to Ms. Heroman's earlier work, rather than revisions. Plus, TS's own advertisement of the Sixth Edition suggested the revisions were unremarkable, informing customers that the Sixth Edition was "an update to Foundational volumes," and that some components were "virtually unchanged." FAC, ¶ 21, 23; Pl.'s Resp. 12. As previously stated, ambiguity in contract arises when a reasonably prudent person can devise multiple interpretations of a contract. At this stage, with all inferences necessarily in favor of the nonmovant, the scope of the revisions to the Sixth and Deluxe Editions, as well as the terms of the contract, create ambiguity about whether Ms. Heroman should have received royalties. Therefore, dismissal would be improper because such ambiguity suggests TS may have breached a contractual obligation to Ms. Heroman.

In sum, because I find that the contract between Ms. Heroman and TS is susceptible of two inconsistent but reasonable interpretations of the various agreements that comprise it, it is ambiguous. And, because Ms. Heroman's interpretation is not unreasonable, the motion to dismiss must be denied.

For the foregoing reasons, I find that the complaint pleads allegations under which a reasonable person could find TS owes Ms. Heroman additional royalties for the System, and therefore I will DENY the motion to dismiss and allow the case to proceed. A separate order follows.

DATED this 24th day of November 2020.

                                                                             BY THE COURT:

                                                                             /S/

                                                                       Paul W. Grimm
                                                                       United States District Judge